JINA L. CHOI (Admitted to the New York Bar)
MICHAEL S. DICKE (Cal. Bar No. 158187)
  dickem@sec.gov
SHEILA E. O'CALLAGHAN (Cal. Bar No. 131032)
  ocallaghans@sec.gov
ROBERT J. DURHAM (Admitted to the New York Bar)
  durhamr@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104-4802
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>    v.<br><br>MICHAEL B. FERGUSON and<br>TRANSACTIONS UNLIMITED,<br><br>            Defendants. | Case No. 3:14-cv-04188<br><br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY OF THE ACTION

1.      From at least 2005 to at least 2013, Michael B. Ferguson used Transactions Unlimited dba ATM Plus ("ATM Plus") to raise at least $12 million from over 160 investors by making false and misleading representations regarding the profitability and purported business of ATM Plus. Ferguson sold investments in ATM Plus by claiming that ATM Plus owned and/or operated automated teller machines ("ATMs") located in malls around the country.  He also claimed that ATM Plus had lucrative branding deals with several major distributors of ATMs and banks, under which ATM Plus made money by finding banks to put their logos on the distributors' ATMs.  In reality,

Ferguson used ATM Plus, which was based in San Francisco, California, to run a Ponzi scheme. Although Ferguson and ATM Plus paid investors millions in purported profits, the vast majority of those funds was new investor money.  Ferguson and ATM Plus also continued to pay to investors purported profits in 2012 and 2013, well after ATM Plus stopped receiving any money from its ATM and branding operations.

2.      Ferguson went to great lengths to conceal the fraud.  For example, he had ATM Plus send investors monthly account statements that contained fabricated transaction histories for ATM machines.  These account statements purported to show that monthly payments to investors were being made from revenue ATM Plus was earning from ATM operations, rather than from new investor money.  He also sent at least one investor a forged contract purporting to show that ATM Plus recently purchased a large number of ATM machines.

3.      Ferguson and ATM Plus (together, "Defendants") violated numerous provisions of the federal securities laws, including the antifraud statutes, by misappropriating investor assets and making materially false and misleading statements in connection with the purchase or sale of securities.  The Commission seeks to enjoin the Defendants from further violations of the securities laws, disgorgement of ill-gotten gains plus prejudgment interest thereon, and payment of civil monetary penalties.

## JURISDICTION AND VENUE

4.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b) and 77t(d), and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d) and 78u(e). This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d)(1) and 77v(a), and Sections 21(d)(3), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), 78u(e) and 78aa.  Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices and courses of business alleged in this complaint.

5.      Venue in this District is proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because the Defendants are found, are

1  inhabitants of, or transact business in this District, and offerings and sales of securities, in which the

2  Defendants participated, took place in this District.

3                           **INTRADISTRICT ASSIGNMENT**

4       6.       Intradistrict assignment to the San Francisco Division is proper pursuant to Local Civil

5  Rule 3-2(c) because ATM Plus's principal place of business during the relevant period was in the

6  County of San Francisco.

7                                    **DEFENDANTS**

8       7.       Defendant Michael B. Ferguson, age 45, resided during the majority of the relevant

9  period in San Francisco, California.  Ferguson is the president, sole owner and operator of ATM Plus

10 and is the only authorized signer on ATM Plus's bank accounts.  In January 2014, Ferguson filed for

11 personal bankruptcy.  In March 2014, Ferguson was arrested in connection with a felony complaint

12 filed by the Santa Clara County, California District Attorney's Office.

13      8.       Defendant Transactions Unlimited is a Nevada corporation that, during the relevant

14 period, did business as Transactions Unlimited, Inc., ATM Plus, Inc., and ATM Plus (together,

15 "ATM Plus") and was based in San Francisco.  It does not appear that ATM Plus has been operating

16 since Ferguson's arrest.

17                            **FACTUAL ALLEGATIONS**

18      9.       From at least 2005 through at least November 2013, the Defendants fraudulently

19 raised at least $12 million from at least 160 investors by offering and selling two different types of

20 securities.  The first was in the form of investment contracts known as "ATM Management and

21 Operation Agreements."  The second was in the form of promissory notes.  Investors were from

22 several different states, and many were from the San Francisco Bay Area.  Ferguson solicited

23 investors for ATM Plus by speaking with them by phone, communicating through email, and meeting

24 with them in person, sometimes at the investor's home.

25                        **ATM Plus's Purported ATM Operations**

26      10.      Ferguson offered and sold investments in ATM Plus first by telling investors that

27 ATM Plus either owned or operated ATMs located in malls around the country and that investors

28 would share in revenue generated by the machines.  Investors paid ATM Plus to invest in one or more

ATMs (usually $12,500 per machine), or in a pool of machines, with the right to receive a portion of the revenue generated by the machines, after ATM Plus deducted its management fee and purported operating expenses.  Some investors selected the ATMs in which they wanted to invest from a list that Ferguson provided.  Investor money was deposited into ATM Plus's bank account.

11.     The investment was documented by an ATM Management and Operation Agreement, which Ferguson signed on behalf of ATM Plus and provided to investors.  The agreement listed the amount that ATM Plus would pay the investor for each ATM transaction that took place at the machine (for example, $0.14 per transaction) and detailed ATM Plus's role in managing the ATM. Investors did not play a role in managing or operating the machines.  Rather, according to the agreement, ATM Plus was responsible for obtaining insurance for the machines and the cash in the machines, contracting with an ATM processor to supply network access links, and providing machine supplies and maintenance.  The term of the agreement was specified (usually five years) and automatically renewed at the end of the term.  After a certain period of time, ATM Plus was obligated to repurchase the contract from the investor if the investor wanted to terminate the agreement.

12.     After investors entered into the ATM Management and Operation Agreement, ATM Plus mailed them monthly account statements and checks (which Ferguson signed) that made it seem like investors were receiving a portion of revenue generated by the ATMs.  The account statements included the fee per ATM transaction that had been agreed upon (for example, $0.14 per transaction) and the number of transactions at the ATM for the month, which served as the basis for the purported calculation of the investor's monthly payment.  Ferguson fabricated the number of ATM transactions in these account statements.

13.     In fact, ATM Plus earned far less from ATM operations than it was paying out to investors (and earned nothing from such operations since at least early 2010), but was paying investors with new investor money.  As a result, Ferguson's representations to investors, the ATM Management and Operation Agreement, and account statements, which all suggested that investors would be paid from revenue from ATM operations, were false and misleading.

1

**ATM Plus's Purported ATM Branding Agreements**

2      14.    A few years after ATM Plus and Ferguson began selling investments in ATMs, they

3  began selling other investments in what they called the "ATM Plus Funds."  Here, Ferguson told

4  prospective investors that ATM Plus had agreements with several ATM owners and distributors to

5  find banks, for a fee, who wanted to put their logos on those ATMs (known as ATM "branding").

6  Ferguson also provided some of the ATM Plus Fund investors with a marketing presentation

7  prominently displaying ATM Plus's logo that described the branding agreements and claimed that

8  ATM Plus had partnerships with three major ATM distributors (who had 60,000 ATMs combined)

9  and that certain major banks were ATM Plus's branding clients.  The marketing presentation claimed

10  that the fees paid by the banks for branding were the basis of the monthly returns paid to investors in

11  the ATM Plus Funds.  Ferguson emailed the presentation to at least 20 prospective investors from at

12  least 2011 through at least 2013.  However, several of the purported partnership and client

13  relationships detailed in the ATM Plus Fund marketing presentation did not exist at the time

14  Ferguson sent the presentation to prospective investors and since at least early 2011, ATM Plus was

15  not earning revenue from branding agreements.

16      15.    ATM Plus issued promissory notes to these ATM Plus Fund investors, which usually

17  carried an annual interest rate of 15% and were usually due in five years.  The promissory notes,

18  which Ferguson signed on behalf of ATM Plus and provided to investors, stated that they were

19  secured by the revenue ATM Plus was owed under specific branding agreements.  To the ATM Plus

20  Fund investors, ATM Plus mailed monthly account statements and checks (which Ferguson signed)

21  representing interest payments on the notes.  Some of these investors invested in additional ATM

22  Plus promissory notes after receiving purported monthly returns on their original investments.

23      16.    In reality, from at least early 2011, ATM Plus did not earn or receive any income from

24  branding agreements, and it used new investor money, rather than profits from its purported business,

25  to pay existing investors.  As a result, the statements that ATM Plus was receiving revenue from

26  branding agreements were false and misleading.

27

28

**Ferguson and ATM Plus Intentionally Deceived Investors**

17.     Ferguson knew, or was reckless in not knowing, that ATM Plus was not making enough money from its purported ATM operations or branding agreements to pay returns to investors and that he was instead using new investor money to pay those returns.  Ferguson was the sole signer on ATM Plus's bank accounts.  He monitored those bank accounts to keep track of how much money was coming in and going out of ATM Plus.  He also periodically reviewed ATM Plus's financial statements, which showed no income from ATM operations or branding since at least 2010 and 2011, respectively.  He continued, however, even after ATM Plus was earning no money from its operations, to pay investors their purported profits.

18.     He further knew, or was reckless in not knowing, that the statements he made orally to investors and prospective investors, in the written ATM Management and Operation Agreements, and in the written promissory notes for the ATM Plus Funds, regarding the existence and profitability of ATM Plus's ATM operations and branding business were false and misleading.

19.     He further knew, or was reckless in not knowing, that the statements he made in the monthly account statements sent to investors in both the ATM operations and branding business regarding the investors' purported profits were false and misleading.

20.     He further knew, or was reckless in not knowing, that the statements he made in the ATM Plus Funds marketing presentations were false and misleading because he negotiated and signed all of ATM Plus's branding agreements.  Accordingly, he was well aware that ATM Plus did not have certain purported agreements in place when he solicited investors for the ATM Plus Funds.

21.     All of these statements were material because they suggested to investors that Ferguson and ATM Plus were operating a bona fide, profitable business, which helped the Defendants keep their scheme operating.  Some investors made additional investments in ATM Plus after receiving the false and misleading account statements and monthly checks.  Ferguson also provided some potential investors with the names of existing investors (who were receiving monthly payments) to serve as references.  Some investors invested after learning of the significant payments existing investors were receiving from ATM Plus.

22.     Ferguson took additional steps to hide from investors the fact that ATM Plus did not have sufficient income from its operations to pay investors.  For example, in April 2012, Ferguson told one investor that ATM Plus had recently purchased a pool of 22 ATMs and solicited her to invest in the pool.  After the investor asked Ferguson for reassurances about the security of the investment, Ferguson sent her a contract purporting to show that ATM Plus had recently purchased 22 ATMs from a distributor of ATMs.  In fact, the contract was a fake, the distributor's signature on the contract was forged, and the distributor never sold any ATMs to the Defendants.  After receiving the phony contract, the investor made an additional investment in ATM Plus.

23.     Additionally, in 2009 and again in 2012, when two investors asked Ferguson whether ATM Plus was a Ponzi scheme, he falsely assured them in writing that it was not.  One of these investors expressed concern to Ferguson because she was considering investing a large part of her life savings in ATM Plus.

24.     From at least 2005 and continuing through at least 2013, by way of his fraudulent scheme, including the false and misleading statements and omissions described above, ATM Plus and Ferguson raised at least $12 million from investors.  During this period, ATM Plus and Ferguson returned at least $10 million to investors, and Ferguson received at least $900,000 from ATM Plus.  ATM Plus made monthly payments to investors until late 2013.

25.     At all times relevant to the facts alleged in this Complaint, ATM Plus acted by and through Ferguson.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act)

26.     Paragraph numbers 1 through 25 are re-alleged and incorporated herein by reference.

27.     Defendants have, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions,

1 practices, or courses of business which operated or would operate as a fraud or deceit upon the

2 purchasers of such securities.

3     28.     By reason of the foregoing, Defendants have directly or indirectly violated

4 Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and unless restrained and enjoined will

5 continue to violate this provision.

6                     **SECOND CLAIM FOR RELIEF**

7     **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

8     29.     Paragraph numbers 1 through 25 are re-alleged and incorporated herein by reference.

9     30.     Defendants, by engaging in the conduct set forth above, directly or indirectly, by use

10 of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national

11 securities exchange, with scienter:

12     (a) employed devices, schemes, or artifices to defraud by, among other things, paying investor

13 returns with new investor money, providing monthly account statements and checks to investors

14 purporting to show that investor returns were based on ATM Plus's operations, providing a forged

15 contract to at least one investor, and referring prospective investors to existing investors who had

16 received payments purporting to be from ATM Plus's operations;

17     (b) made untrue statements of material fact or omitted to state material facts necessary in

18 order to make the statements made, in light of the circumstances under which they were made, not

19 misleading by, among other things, falsely stating orally, in emails, in written investment agreements

20 and promissory notes with investors, and in monthly account statements to investors that ATM Plus

21 owned and/or operated ATMs, that it had branding agreements, that ATM Plus earned revenue from

22 ATM operations and branding agreements, and that investor returns were paid from that revenue; and

23     (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud

24 or deceit upon other persons by, among other things, paying investor returns with new investor

25 money, providing monthly account statements and checks to investors purporting to show that

26 investor returns were based on ATM Plus's operations, providing a forged contract to at least one

27 investor, and referring prospective investors to existing investors who had received payments

28

COMPLAINT – 3:14-CV-04188                 8

1  purporting to be from ATM Plus's operations, all in connection with the purchase or sale of

2  securities.

3       31.    By reason of the foregoing, Defendants have directly or indirectly violated

4  Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

5  § 240.10b-5, and unless restrained and enjoined will continue to violate these provisions.

6                        **THIRD CLAIM FOR RELIEF**

7               **(Violations of Sections 5(a) and 5(c) of the Securities Act)**

8       32.    Paragraph numbers 1 through 25 are re-alleged and incorporated herein by reference.

9       33.    Defendants, by engaging in the conduct set forth above, directly or indirectly, made

10 use of the means or instruments of transportation or communication in interstate commerce or of the

11 mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no

12 valid registration statement had been filed or was in effect as to such offers and sales of such

13 securities and no exemption from registration was available.

14      34.    By reason of the foregoing, Defendants have directly or indirectly violated Sections

15 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and unless restrained and

16 enjoined will continue to violate these provisions.

17                         **PRAYER FOR RELIEF**

18      WHEREFORE, the Commission respectfully requests that the Court:

19                                  I.

20      Permanently enjoin Defendants from directly or indirectly violating Sections 5(a), 5(c)

21 and 17(a) of the Securities Act, 15 U.S.C. §§ 77(e)(a), 77(e)(c) and 77q(a), Section 10(b) of the

22 Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

23                                 II.

24      Enter an order requiring Defendants to disgorge their ill-gotten gains according to proof, plus

25 prejudgment interest thereon.

26                                 III.

27       Enter an order requiring Defendants to pay civil penalties pursuant to Section 20(d) of the

28 Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

V.

Grant such other and further relief as this Court may determine to be just, equitable and necessary.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Securities and Exchange Commission demands a trial by jury for all issues so triable.

Dated:  September 29, 2014                    Respectfully submitted,


                                              */s/ Robert J. Durham*
                                              Robert J. Durham
                                              Attorney for Plaintiff
                                              SECURITIES AND EXCHANGE COMMISSION